[No. B146784. Second Dist., Div. Four. Oct. 31, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE ANTONIO RENTERIA, Defendant and Appellant.

**COUNSEL**

Eileen S. Kotler, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Acting Chief Assistant Attorney General, Marc E. Turchin, Acting Assistant Attorney General, Steven D. Matthews and Xiomara Costello, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**EPSTEIN, J.**—Defendant appeals his carjacking and robbery convictions. He raises three issues, but we need only discuss one, since that one requires reversal. The trial court substituted in an alternate juror to replace a juror who was ill, but failed to give the newly constituted jury the mandatory instruction that it disregard its previous deliberations and begin deliberations anew. That is constitutional error under the California Constitution, and requires reversal in this case under the standard of *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].

### FACTUAL AND PROCEDURAL SUMMARY

Francisco Gonzalez returned home in his sports utility vehicle shortly before 10:00 p.m. on a fall evening. He exited the vehicle to open the driveway gate. Turning back to the car, he saw a person some 11 feet away pointing a gun towards his face. The person was wearing a white T-shirt and black baggie pants. The man said, "What's up" and cocked the gun. Gonzalez said "Be cool, be cool" and backed into the house. The man got into Gonzalez's vehicle and drove it off. Gonzalez called 911 to report the theft.

The vehicle was equipped with a Lo-Jack device, which emits a signal enabling police to track its location. Shortly after the theft, two officers on patrol received a Lo-Jack hit and tracked it to the rear of a yard, where they saw Gonzalez's vehicle. It was parked near another vehicle and there were tools on the ground close to a tire. A neighbor told them that persons had been in the backyard and had run into the house. The officers knocked on the door of the house and were admitted into the residence by an "older" man. In a bedroom, they found four men, three initially and one soon thereafter. Two teenage girls also were present, as was a teenage male hiding between the bed and the wall.

The two officers gave somewhat differing descriptions of the teenager. According to one of them, he was wearing a white shirt and blue jeans. According to the other officer, he was wearing black warm-up pants and a white tank top T-shirt. According to one officer, he was about 19-20 years old, 5 feet 6 inches tall, and weighed about 160 pounds. According to the other, he was about 5 feet 7 inches tall and weighed 140-150 pounds. The teenager and one of the men had shaved heads. One of the officers testified that it seemed to him that the other three men did not know the teenager.

The teenager and the other three men were placed in a field show-up. Gonzalez was taken to the location, where he identified defendant as the robber. Defendant was one of the three men initially discovered; he was not the teenager.

The police found clothing belonging to Gonzalez under the bed in the bedroom, and in a crawl space above the laundry room of the house they found guns and ammunition. Gonzalez identified one of the guns as the one that had been pointed at him.

After the field show-up, Gonzalez overheard one of the officers say that all of the persons detained were gang members. Gonzalez then said that he was unsure of his identification. Three days later, two men came to Gonzalez's residence and said that defendant's mother wanted to know why he had picked out defendant. Gonzalez denied having done so, saying that he had only given a description of the robber. He did not identify defendant as the robber at the felony preliminary hearing, or at trial. His field show-up identification was based on defendant's height and clothing. At the preliminary hearing, he first testified that the robber was about 6 feet tall and weighed 190 pounds, then that he could have been 5 feet 8 inches to 5 feet 9 inches.

Defendant did not put on a case-in-chief, but relied on evidence impeaching Gonzalez's out-of-court identification and his failure to identify defendant at court proceedings. He also pointed out that fingerprints recovered

from the vehicle were not shown to match those of defendant. His theory was that the robber was either the juvenile, or a relative of the man who admitted police to the residence, and who was not included in the lineup (because he appeared to be older than those who were included). Ultimately, the jury credited Gonzalez's out-of-court identification, and convicted defendant of carjacking and robbery.

Several months before the present episode, defendant had been arrested and charged with illegal possession of marijuana. (Health & Saf. Code, § 11350, subd. (a).) He pled guilty to that charge and was placed in a deferred entry of judgment program, pursuant to Penal Code section 1000.2 (all further statutory references are to that code unless another is specified). Once he was charged with carjacking and robbery (§§ 215, subd. (a), 211), his deferred status was revoked and the marijuana case set for probation violation hearing. That hearing was continued some 24 times while the carjacking case pended. Defendant was sentenced to 19 years in state prison, consisting of 9 years for carjacking and 10 years for firearm use in that crime (§ 12022.53, subd. (b)). Execution of a three-year term for robbery was suspended and stayed pursuant to section 654. The appropriate fines were imposed.

Defendant's new trial motion, which raised issues other than those presented on appeal, was denied. He filed a timely notice of appeal.

### DISCUSSION

Defendant raises three issues on appeal. One claim is that he received ineffective assistance of counsel when his attorney stipulated to excuse a juror who said she was ill and to replace her with an alternate juror. His argument of ineffective representation is based, in part, on the fact that the jury had declared itself deadlocked 11 to 1 minutes before the ill juror was excused. Another claim is that the trial court erred in giving CALJIC No. 17.41.1. We do not decide the merits of either of these claims in light of our decision on the remaining claim. We simply note that when the juror brought her illness to the trial court's attention, the court inquired of the other jurors and ascertained that three of them would have a problem returning the next day in this brief trial, and that it was not then revealed whether the jury was leaning for conviction or acquittal and, most important, whether the ill juror was in the minority or the majority. As to the instruction, we note that we have consistently taken the position that No. 17.41.1 is a proper instruction, and that its validity is now before the Supreme Court in *People v. Engleman*, S086462. The decision on that question is likely to be known before retrial of the charges in this case.

 That takes us to defendant's final claim of error: that the trial court failed to instruct the jury, newly constituted by the addition of an alternate in place of the excused juror, to put aside its deliberations to that point and to begin its deliberations anew.

The situation is covered by a pattern instruction, CALJIC No. 17.51, which the trial court failed to give. As we shall explain, the substance of this instruction is mandatory when an alternate is substituted onto the jury after deliberations have begun.

The omitted instruction informs the jury that the substitution has occurred, that both sides have the right to a verdict reached "only after full participation of the twelve jurors who return the verdict," and that this right can be assured only if deliberations begin "again from the beginning." (CALJIC No. 17.51 (6th ed. 1996).) Hence, the jury should be instructed: "You must therefore set aside and disregard all past deliberations and begin deliberating anew. This means that each remaining original juror must set aside and disregard the earlier deliberations as if they had not taken place." (*Ibid.*)

This case was submitted to the jury at 11:35 in the morning. We infer, although the record does not tell us for certain, that there was a break for lunch. At 3:00 o'clock that afternoon, the jury sent out a note announcing that it was unable to reach a verdict. A few minutes after that, a juror declared that she was ill and unable to continue that day, although she thought she could come back the next day. By stipulation, she was excused and replaced by an alternate juror. The jury resumed deliberations at 3:15 the same afternoon, after being instructed simply to "go back into the jury room and continue your deliberations." The alternate had been permitted to be in the jury room during its earlier deliberations, but was under an instruction not to participate. Thirty minutes after the jury was reconstituted by substitution of the alternate, it returned with guilty verdicts and true findings on special allegations.

In its final paragraph, section 1089 provides for discharge of a juror unable to perform his or her duties, as when a juror becomes ill, and the substitution of an alternate juror in that juror's place. The statute does not specifically provide for an admonition that the newly constituted jury must set aside its earlier deliberations and begin anew. But that admonition is constitutionally required.

The leading case is *People v. Collins* (1976) 17 Cal.3d 687 [131 Cal.Rptr. 782, 552 P.2d 742] (*Collins*). A principal issue in *Collins* was whether the procedure allowing substitution of an alternate, rather than declaration of a

mistrial with a consequent retrial, offended the double jeopardy rule of the state or federal Constitution. The court held that it did not, "when good cause has been shown and the jury has been instructed to begin deliberations anew." (*Id.* at p. 691.) Allowing the trial to continue rather than start over is desirable in order to maintain judicial efficiency. But since substitution may impinge upon a defendant's constitutional right to jury trial, it was necessary to examine the nature of that right. (*Id.* at p. 692.)

■ The right to trial by jury is guaranteed as it existed at common law when the California Constitution was adopted; it may not be abridged by legislation, although the Legislature may establish reasonable conditions and regulations so long as the essential elements of the right are preserved. (*Collins, supra,* 17 Cal.3d at p. 692.) These elements are part of the broader right, which "requires each juror to have engaged in all of the jury's deliberations. . . . The requirement that 12 persons reach a unanimous verdict is not met unless those 12 reach their consensus through deliberations which are the common experience of all of them. It is not enough that 12 jurors reach a unanimous verdict if 1 juror has not had the benefit of the deliberations of the other 11. Deliberations provide the jury with the opportunity to review the evidence in light of the perception and memory of each member. Equally important in shaping a member's viewpoint are the personal reactions and interactions as any individual juror attempts to persuade others to accept his or her viewpoint. The result is a balance easily upset if a new juror enters the decision-making process after the 11 others have commenced deliberations. The elements of number and unanimity combine to form an essential element of unity in the verdict. By this we mean that a defendant may not be convicted except by 12 jurors who have heard all the evidence and argument and who together have deliberated to unanimity." (*Id.* at p. 693.)

The Supreme Court rejected the prosecution's argument that there is no constitutional error in substituting an alternate juror after deliberations have begun, even though the jury is not instructed to begin deliberations anew. It also rejected the defense's argument that a mistrial must be declared when a juror is discharged after deliberations have begun. (*Collins, supra,* 17 Cal.3d at p. 693.)

■ While the statute does not expressly require an admonition to disregard previous deliberations and to begin anew, it must be construed to impose that requirement in order to pass constitutional muster. "We accordingly construe section 1089 to provide that the court instruct the jury to set aside and disregard all past deliberations and begin deliberating anew." (*Collins, supra,* 17 Cal.3d at p. 694.) The court expressed its confidence that

jurors made aware of the rights involved will faithfully follow the instruction. (*Ibid.*)

The court was careful to ground its ruling on the jury trial provision of the state Constitution, article I, section 16, rather than on the federal Constitution. (*Collins, supra,* 17 Cal.3d at p. 692, fn. 3.) Having so concluded, the court went on to hold that a failure to properly admonish the jury is not per se reversible error. Instead, since the admonition requirement is imposed as a function of the state Constitution rather than by federal law, error is tested by the standard of *People v. Watson, supra,* 46 Cal.2d 818, 836: it is reversible only if it is probable that the defendant would have achieved a better result but for the error. (*Collins, supra,* at p. 697, fn. 5.) In *Collins,* the error was not reversible because of the strength of the evidence of guilt. (*Ibid.*)

*Collins* has been consistently applied and remains the law of California. (See *People v. Valles* (1979) 24 Cal.3d 121, 128 [154 Cal.Rptr. 543, 593 P.2d 240, 15 A.L.R.4th 1116] [admonition must be given even though alternate who was substituted to replace discharged juror had been in jury room during deliberations]; *People v. Odle* (1988) 45 Cal.3d 386, 405 [247 Cal.Rptr. 137, 754 P.2d 184] [instructing jury to start deliberations "from scratch" was proper, but implication that new juror could be brought up to speed with respect to earlier deliberations was not]; *People v. Anderson* (1990) 52 Cal.3d 453, 482 [276 Cal.Rptr. 356, 801 P.2d 1107] [court not required to voir dire jurors upon substitution of alternate to ascertain their ability to follow instruction to disregard previous deliberations and begin anew]; *People v. Cunningham* (2001) 25 Cal.4th 926, 1028 [26 Cal.4th 797a, 108 Cal.Rptr.2d 291, 25 P.3d 519] [admonition not required when alternate is substituted in after guilty verdict in capital case but before deliberations on penalty phase have begun]; *People v. Martinez* (1984) 159 Cal.App.3d 661, 664 [205 Cal.Rptr. 636] [not enough to instruct jury to begin deliberations anew; jury also must be admonished to disregard all past deliberations, lest views of discharged juror be used in reaching decision].)

Since there is a state constitutional right to jury trial in civil cases to the extent recognized when our original Constitution was adopted in 1850, the *Collins* rule applies to those cases as well. (*Griesel v. Dart Industries, Inc.* (1979) 23 Cal.3d 578, 583 [153 Cal.Rptr. 213, 591 P.2d 503], overruled on another ground in *Privette v. Superior Court* (1993) 5 Cal.4th 689, 702, fn. 4 [21 Cal.Rptr.2d 72, 854 P.2d 721].) The civil statute construed in *Griesel,* former Code of Civil Procedure section 605, like its criminal counterpart, did not specifically require an admonition when an alternate was substituted onto the jury after deliberations had begun, but the reasoning of *Collins* is equally applicable. (See now Code Civ. Proc., § 234.)

Respondent argues that defendant's claim of error is waived (forfeited: see *Cowan v. Superior Court* (1996) 14 Cal.4th 367, 371 [58 Cal.Rptr.2d 458, 926 P.2d 438]) because his attorney did not raise the issue when the alternate replaced the discharged juror. Respondent is mistaken. An instruction, not correct in law, such as the inadequate instruction given in this case, is deemed excepted to, and in this case, it affected the substantial rights of the defendant. For that reason, the failure to request a proper instruction containing the admonition does not bar defendant from asserting the point on appeal. (See *Griesel v. Dart Industries, Inc., supra*, 23 Cal.3d at p. 583, fn. 4; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7 [86 Cal.Rptr.2d 243, 978 P.2d 1171].)

Respondent relies on *People v. Davidian* (1937) 20 Cal.App.2d 720 [67 P.2d 1085], *People v. Fudge* (1994) 7 Cal.4th 1075, 1101 [31 Cal.Rptr.2d 321, 875 P.2d 36], *People v. Ruiz* (1975) 14 Cal.3d 163, 165, fn. 2 [120 Cal.Rptr. 872, 534 P.2d 712], and *People v. Dell* (1991) 232 Cal.App.3d 248 [283 Cal.Rptr. 361], for the proposition that defendant's failure to object to the trial court's omission bars that ground as a basis for error on appeal. None of these cases are on point. In *Davidian* the principal issue was whether section 1089 is constitutional, an issue decided definitively nearly 40 years later in *Collins*. The case had nothing to do with the admonition. The same is true of *Fudge*, *Ruiz* and *Dell*, in each of which the issue discussed was failure to object, or to adequately object, to a juror substitution.

■ Error being manifest, and defendant having not lost his right to assert it on appeal, we pass to the final inquiry: whether the error requires reversal. As we have discussed, the *Watson* standard governs this inquiry. *Collins* itself found the error to be harmless, and subsequent decisions have carefully scrutinized the record on review to determine the issue. Based on that discrete examination, some have found the error reversible, and some not. (See *People v. Odle, supra*, 45 Cal.3d 386, 406 [error not reversible: evidence of guilt was overwhelming, defendant conceded responsibility for crimes, his diminished capacity defense was inconsistent with evidence of his conduct, and jury had deliberated only short time before substitution]; *People v. Martinez, supra*, 159 Cal.App.3d at p. 666 [error reversible: close case, and even though jury deliberated only two and one-fourth hours before substitution and six days thereafter; previous deliberations were sufficient to formulate a conclusion influenced by views of discharged juror, and may have done so without the admonition].)

In the case before us, the jury had deliberated some hours before the substitution was made, but reached a verdict some 30 minutes after it was

made. The jury had reported itself at impasse, unable to reach a verdict, at almost the same time the ill juror said she could not continue to serve that afternoon, and was discharged for that reason. The entire case depended on identification: there was no doubt that a carjacking had occurred, the only question being whether defendant was the carjacker. It could have been he, or one of the other men at the house where the carjacked vehicle was found. The victim, the only eyewitness to the crime, recanted his on-the-scene identification. The crime itself was brief, and committed in the nighttime. Finally, there were some discrepancies in identification. On the other hand, there was the victim's field identification, apparently admissible under the prior inconsistent statement and prior identification hearsay exceptions (Evid. Code, §§ 1235, 1238), and the inference that he had changed his testimony out of fear of gang retaliation. Resolution of the conflicting evidence was for a properly instructed jury to determine.

Taking all the circumstances into account, including especially the fact that the only contested issue in the case was identification, the only eyewitness did not testify that defendant was the carjacker, and the very short time that elapsed between substitution of the alternate to the jury and the verdict, we cannot say the error was harmless.

### DISPOSITION

The judgment (conviction) is reversed.

Vogel (C. S.), P. J., and Curry, J., concurred.